[Cite as *Mack v. Ohio Dept. of Rehab. & Corr.*, 2016-Ohio-2877.]

| | |
|---|---|
| LEVIO D. MACK | Case No. 2014-00317 |
| Plaintiff | Magistrate Robert Van Schoyck |
| v. | <u>DECISION OF THE MAGISTRATE</u> |
| OHIO DEPARTMENT OF REHABILITATION AND CORRECTION | |
| Defendant | |

{¶1} Plaintiff, an inmate in the custody and control of defendant at the Marion Correctional Institution (MCI), brought this action for negligence arising from an incident in which another inmate attacked and injured him on December 21, 2013. The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

{¶2} Plaintiff testified that, at the time of trial, he had been living at MCI for about three years, following several years of incarceration at other institutions. Plaintiff stated that around 8:00 p.m. on December 21, 2013, he was on the telephone in the corner of the dayroom in his housing block, K Block, talking to his brother. Plaintiff related that the block housed up to 128 inmates, and that many of them were in the dayroom at that point, socializing or otherwise spending some time out of their cells. Plaintiff testified that he felt something on his shoulder, and when he looked up he saw an inmate by the name of White, who told him to shut up and said "you don't want none of this gangster shit." According to plaintiff, White had a pair of scissors in his hand and made stabbing motions toward him. Plaintiff testified that he jumped up from his seat and tried to guard or defend himself as best he could against the attack from White.

{¶3} Plaintiff testified that Corrections Officer Douglas Dunham had been seated at a desk nearby, and that when the commotion began Dunham stood up and yelled

"Mr. White, stop." Plaintiff recalled that White turned to Dunham and said something, but continued acting aggressively toward plaintiff, and Dunham then left and went into the hallway that separated K Block from an adjacent housing block. As plaintiff recalled, he positioned himself such that there was a cart between him and White, and he was about to pick up a chair with which to defend himself when multiple corrections officers arrived at the scene. Plaintiff stated that one officer told him to stop, and another told White to stop, but White was not compliant. As plaintiff described, officers ended up physically subduing White and taking him to the ground.

{¶4} Plaintiff testified that as a result of White's attack, he sustained approximately six cut or stab wounds on his neck, shoulder, head, and back. Plaintiff stated that a nurse came to the scene to examine him, and from there he was taken to the infirmary, where his wounds were cleaned, and later he was taken to an outside hospital, where two of the wounds were treated with one stitch apiece.

{¶5} According to plaintiff, White had lived in a cell next to his own, but they never had any problems previously. Plaintiff stated that he never spoke with White again.

{¶6} Samuel Bulgin testified that he has been incarcerated at Marion since 2012, and that he lived in K Block at the time of this incident. According to Bulgin, when the incident occurred he was at a table socializing with other inmates after a card game, about ten feet away from the telephone plaintiff was using. Bulgin testified that he saw some movement near the telephone and initially thought it was just horseplay, but later he realized White was punching at plaintiff and had something shiny in his hand. Bulgin also testified that he heard White repeatedly say "you think you can ride for free," but that he did not know what that meant and he did not know what prompted the attack. Bulgin stated that he had not noticed which direction White came from before initiating the attack.

{¶7} Bulgin recalled that the corrections officer who had been sitting behind the desk came out from behind it and gave White commands to back away, but White said "you don't want none of this."  Bulgin stated that other officers eventually entered the housing block, and although White continued to act aggressively with the weapon, officers eventually took him to the ground and subdued him.  Bulgin stated that he could not remember how long it had taken for the officers to respond to the block, nor could he recall how many officers responded.

{¶8} Willie Davis testified that he has been incarcerated at MCI for more than three years, and that he lived in K Block at the time of this incident.  Davis testified that he was at a table just a few feet away from where it occurred.  Davis stated that plaintiff was talking on the telephone in the corner of the dayroom, near the door that opened to the hallway.  Davis stated that White came down the stairs, walked through the dayroom, came up behind plaintiff, and it appeared that White then started punching plaintiff, but Davis later realized plaintiff was being stabbed.  Davis stated that plaintiff appeared to be in shock, but stood up and defended himself.

{¶9} Davis testified that Corrections Officer Dunham had been sitting at a desk very close to where the altercation began.  According to Davis, Dunham got up and yelled at White repeatedly, ordering him to stop and put the weapon down.  Davis testified that once other corrections officers entered the housing block, they attempted to physically restrain White, and although he resisted their efforts, they were able to take him to the ground and subdue him.  Davis stated that he did not know prompted White's attack.

{¶10} Saul Nolen testified by way of deposition.  (Plaintiff's Exhibit A.)  Nolen testified that when this incident occurred, he had been an inmate at MCI since 2008 and he lived in K Block.  Nolen testified that he had been playing cards with some other inmates and had just gotten up to go to the ice machine when the incident occurred.  Nolen stated that plaintiff was using the telephone that was located next to the door.

Nolen recalled that an announcement was made for inmates to go to the "pill call," and soon afterward he saw an inmate he knew as Tom White go walking toward the door as if he was going to the pill call. Nolen stated that, from what he could see, it looked like White started punching plaintiff, and only later did he learn that plaintiff was actually being stabbed. According to Nolen, White kept asking plaintiff, "you think this is a game?" Nolen stated that plaintiff repeatedly asked White what he was talking about.

{¶11} Nolen testified that Corrections Officer Dunham, whom Nolen thought had been in the hallway when this all started, ran toward White and told him to stop. According to Nolen, however, White told Dunham to step back because this was some "gangster shit," and Dunham then went out the door and into the hallway. Nolen testified that he thought the altercation had been going on for about two or three minutes before Dunham told White to stop. Nolen stated that about one minute later, a Corrections Officer Richardson came from across the hall and also told White to stop. Nolen testified that one of the officers activated a man down alarm, and once officers responded they backed White into a corner and eventually restrained him. Nolen stated that there were about seven or eight officers in total at the scene.

{¶12} Corrections Officer Douglas Dunham, who stated that he has been employed with defendant for approximately 20 years, testified that when the accident occurred, his regular assignment was to supervise K Block during the second shift, from 2:00 p.m. to 10:00 p.m. Dunham stated that when the altercation started he was seated at a desk about eight to ten feet away from the telephone that plaintiff was using. Dunham explained that around that time of the evening, most inmates who lived in the housing block were present, and usually there were a number of inmates in the dayroom, and others were in their cells or the showers. He also stated that it can get quite loud at that time of the evening.

{¶13} Dunham testified that at 8:17 p.m., he heard a ruckus by the telephones and immediately stood up and looked in that direction. Dunham stated that he saw

White appear to throw a punch at plaintiff, at which point he started giving White commands to get away from plaintiff. Dunham further stated that he sent a call over his radio with the message "signal three, K Block," which went out to all the corrections officers at MCI who were carrying radios. Dunham explained that he used the radio rather than activating his man down alarm because it was faster, and he also explained that it was a policy at MCI that he summon assistance either with the radio or the man down alarm where there was an active inmate-on-inmate altercation, before physically intervening. Dunham further explained that he was not equipped with a baton or OC spray, per a policy set by prison officials.

{¶14} Dunham testified that he got between the inmates and put his hand up to block White, but White told him this was "gangster shit" and continued to act aggressively. Dunham stated that he also unlocked the door, which was very close by, so that officers responding to the radio call could get into the housing block, but he stated that he never left the block. Dunham recalled that the first responders to arrive were Corrections Officer Richardson, who worked across the hallway in M Block, and Corrections Officer Hall, who worked in the gymnasium. Dunham testified that White refused officers' orders to get on the wall and he continued to move around aggressively, and even after officers took White to the ground he continued to resist until a Corrections Officer Mendoza administered a burst of OC spray.

{¶15} Dunham stated that he did not know White had a weapon until White got up, at which time Dunham observed what appeared to be half a pair of scissors on the floor. According to Dunham, inmates are permitted to have scissors with blunted edges, but this was a standard type that would have been considered contraband. Dunham testified that he had no prior knowledge about White having the scissors, and that he does not know where they came from. Dunham related that random cell searches, or "shakedowns," are conducted routinely to search for contraband, and they can also occur when there is some specific information that would prompt a search of a particular

cell or inmate.  There is one random shakedown every day during the first shift and two per day during the second shift, Dunham stated.  According to Dunham, corrections officers use a computer program to manage the shakedown schedule.

{¶16} Dunham testified that there is a camera in the rear of K Block, on the first floor range, pointed toward the front of the block, and he authenticated a DVD recording of the incident that was captured by this camera.  (Defendant's Exhibit A.)  Dunham also authenticated an audio recording of the telephone call plaintiff was having when the incident began, and he identified his voice on this recording.  (Defendant's Exhibit B.)

{¶17} Jason Bunting, the Warden at MCI, testified that he has served in his current role for more than four years, and has been employed with defendant for close to 19 years in total.  Bunting testified that in the event of an altercation between inmates, corrections officers are trained to first give verbal commands directing the inmates to stop.  Bunting further testified that officers are trained to then request assistance from other officers, and once backup has arrived, to physically break up the altercation if necessary.  In terms of how officers request assistance, Bunting testified that they are permitted to either activate the man down alarm on their person, or call a "signal three" over the radio, if one has been issued to them.  As Bunting described, the man down alarm sends a signal to the control room, indicating only the general location in which it was activated, and then an officer in the control room will announce an alert via loudspeaker stating the location and the name of the officer whose alarm was activated.  Bunting testified that an officer calling for assistance over the radio, however, can immediately convey specific information about the location and circumstances of the incident to others with radios, and in his experience the radio is decidedly more efficient.

{¶18} As for the manner in which officers respond to requests for assistance, Bunting testified that there are phases of responders, such that officers stationed at certain posts throughout the institution respond immediately when a request goes out,

but officers at other posts, even if they are near the location of the request, would remain at their post unless another wave of responders was requested.

{¶19} Bunting also testified that all of the first wave responders who would have come to assist Dunham were stationed at posts where they were authorized to carry OC spray, so long as they had the proper training and certification. Bunting explained, though, that OC spray is not allowed at every post, and Dunham's post in K Block is one of the posts where it is not allowed. Bunting testified that it is up to his discretion, as the Warden, to make decisions about the deployment of OC spray at the institution.

{¶20} Bunting testified about his decision-making process concerning the deployment of OC spray. Bunting explained that historically there had been only a minimal allowance of OC spray at MCI, but in recent years the inmate population has increased significantly and he has elected to allow OC spray at some posts, primarily being in areas where inmates tend to gather in large numbers. Bunting stated that he weighs a number of factors in deciding where to allow OC spray, such as the status of MCI as a medium/minimum level security institution, and the fact that, while OC spray can enhance the safety and security of the institution, greater access to OC spray may result in its misuse, either by corrections officers or by inmates taking it from officers and using it against them. Overall, Bunting stated, he attempts to strike a balance and allow for OC spray in enough areas that it can be an effective response tool. In the case of a general population housing block, such as the one in which plaintiff lived, Bunting stated that he has elected to not allow OC spray at those posts, where one officer is assigned for each block, which house up to 128 inmates.

{¶21} "To recover on a negligence claim, a plaintiff must prove by a preponderance of the evidence (1) that a defendant owed the plaintiff a duty, (2) that a defendant breached that duty, and (3) that the breach of the duty proximately caused a plaintiff's injury." *Ford v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 05AP-357, 2006-Ohio-2531, ¶ 10. "In the context of a custodial relationship between the state

and its prisoners, the state owes a common-law duty of reasonable care and protection from unreasonable risks." *Jenkins v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 12AP-787, 2013-Ohio-5106, ¶ 8. "This duty does not, however, make ODRC the insurer of inmate safety." *Kordelewski v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 00AP-1109 (June 21, 2001). "Although the state is not an insurer of the safety of inmates, once it becomes aware of a dangerous condition it must take reasonable care to prevent injury to the inmate." *Briscoe v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 02AP-1109, 2003-Ohio-3533, ¶ 20. "Reasonable care is that degree of caution and foresight an ordinarily prudent person would employ in similar circumstances, and includes the duty to exercise reasonable care to prevent an inmate from being injured by a dangerous condition about which the state knows or should know." *McElfresh v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 04AP-177, 2004-Ohio-5545, ¶ 16.

{¶22} "Where one inmate attacks another inmate, actionable negligence arises only when there was adequate notice of an impending attack." *Lucero v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 11AP-288, 2011-Ohio-6388, ¶ 18. "Notice may be actual or constructive, the distinction being the manner in which the notice is obtained rather than the amount of information obtained." *Watson v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 11AP-606, 2012-Ohio-1017, ¶ 9. "Whenever the trier of fact is entitled to find from competent evidence that information was personally communicated to or received by the party, the notice is actual. Constructive notice is that notice which the law regards as sufficient to give notice and is regarded as a substitute for actual notice." *Hughes v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 09AP-1052, 2010-Ohio-4736, ¶ 14.

{¶23} Upon review of the evidence presented at trial, the magistrate finds as follows. On December 21, 2013, at approximately 8:17 p.m., plaintiff was on the telephone near the door at the front of his housing block when he was attacked by

inmate White, who quickly stabbed plaintiff multiple times with a pair, or half a pair, of scissors. Corrections Officer Dunham was seated at the officers' desk nearby, and as seen in the video from the security camera, Dunham got up approximately three seconds after the attack commenced, he ran toward the altercation, and he got between the two inmates and put his hand up to separate them.

{¶24} As captured on the recording of plaintiff's telephone call, Dunham yelled "hey" early on, and within no more than ten seconds after the commotion began Dunham had activated his radio and called for assistance, and Dunham continued to yell "hey," "get away," and "White." Dunham also told White to "stop," as plaintiff recalled. From the time that Dunham ran from behind the desk and intervened, White did back away from plaintiff, although he continued to act aggressively while holding the weapon in his hand. The video shows that approximately 15 seconds after the attack commenced, Dunham stepped a few feet away to unlock the door, at which time it appears that White may have delivered or attempted to deliver another blow to plaintiff, although nearly every wound that plaintiff sustained during this incident came in quick succession at the very outset. As seen in the video, the first of several corrections officers to respond to Dunham's call for assistance arrived approximately 22 seconds after the attack commenced. From there, there were no further hostilities between the inmates and White was eventually subdued.

{¶25} Defendant had no notice, constructive or actual, from which it knew or should have known the attack was impending. Although White walked past Dunham's desk as he proceeded toward plaintiff to carry out the attack, White lived in this housing block and was permitted to walk in that area, White was one of many inmates walking around the dayroom at that busy time of the evening, and from the testimony of Dunham and the inmates who were in the area it was established that White's attack came as a surprise, it was not apparent that White had a weapon on him before the attack, and Dunham did not have reason to know that the attack was going to occur.

{¶26} Additionally, Dunham's response to the attack was reasonable. Dunham swiftly intervened by running to the altercation, physically inserting himself between the inmates, putting his hand up to hold White at bay, and yelling at White and giving him verbal commands. Dunham also timely requested assistance over the radio, in accordance with the internal policy at MCI, and officers quickly responded to the scene. Dunham never idly stood by or otherwise failed to act reasonably in response to the circumstances that he faced. Contrary to plaintiff's testimony that Dunham left the block and went into the hallway, the video shows that Dunham never the left the block.

{¶27} Although plaintiff argued that the use of OC spray would have helped resolve the matter more quickly, per the policy at MCI Dunham was not allowed to have OC spray at his post. The testimony of Warden Bunting showed that the decision on where OC spray was allowed throughout the institution was a basic policy decision characterized by a high degree of official judgment or discretion. The language in the Court of Claims Act at R.C. 2743.02 providing that "'the state' shall 'have its liability determined * * * in accordance with the same rules of law applicable to suits between private parties * * *'" means that the state cannot be sued for its legislative or judicial functions or the exercise of an executive or planning function involving the making of a basic policy decision which is characterized by the exercise of a high degree of official judgment or discretion." *Reynolds v. State*, 14 Ohio St.3d 68, 70 (1984). Prison officials such as Warden Bunting are afforded "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). Accordingly, on the issue of whether Dunham should have been equipped with OC spray, defendant is entitled to discretionary immunity.

{¶28} As to the use of OC spray by the officers who responded to Dunham's call for assistance, the video demonstrates that once responders began arriving at the housing block, White was separated from plaintiff, and plaintiff sustained no further

harm. It was not shown that the responders breached their duty of care toward plaintiff at all, whether through their acts or omissions relative to OC spray or otherwise.

{¶29} Plaintiff also argued that when the MCI control room relayed Dunham's signal three announcement over the loudspeaker, the wrong housing block was identified as the location, and that this constituted negligence which resulted in a delayed response. However, Dunham's signal three announcement over the radio was immediate and it directed the responders where to go. Reviewing the video and telephone recordings in conjunction with one another, it appears that responders began arriving to the scene just before the control room made its announcement and that they continued arriving thereafter, and, as previously stated, plaintiff sustained no further harm from the time responders started arriving. Even if the control room misidentified the location of the emergency, plaintiff cannot demonstrate any resulting harm.

{¶30} Lastly, to the extent that plaintiff argued defendant was negligent in its supervision of the housing block insofar as White was able to procure and use the weapon, defendant had a policy of regularly inspecting the block for weapons and other contraband and the evidence does not demonstrate that defendant failed to follow its policy or that defendant otherwise failed to use reasonable care to prevent the presence of such weapons. In short, White's use of the weapon was not shown to have resulted from negligence on the part of defendant.

{¶31} Based on the foregoing, the magistrate finds that plaintiff failed to prove his claims by a preponderance of the evidence. Accordingly, judgment is recommended in favor of defendant.

{¶32} *A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i). If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed. A party shall not assign as error on appeal the court's adoption of*

*any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

ROBERT VAN SCHOYCK
Magistrate

cc:

Richard F. Swope
6480 East Main Street, Suite 102
Reynoldsburg, Ohio 43068

Jeanna V. Jacobus
Assistant Attorney General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

**Filed March 24, 2016**
**Sent To S.C. Reporter 5/9/16**